**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | **CRIMINAL NO. PWG-19-0140** |
| **RODNEY MATTHEWS,** | |
| **Defendant** | |

**RESPONSE IN OPPOSITION TO
DEFENDANT'S APPEAL OF DETENTION ORDER**

On April 14, 2020, the defendant filed a motion to reopen detention hearing and vacate his order of detention. ECF 214. The only novel claim in this motion is that COVID-19 is a changed circumstance meriting the defendant's release. This Court and the United States District Court for the District of Columbia have recently denied similar claims by detainees housed in the Chesapeake Detention Facility and in facilities run by the D.C. Department of Corrections ("DOC"). *See United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209 (Order by Judge Grimm); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by Magistrate Judge Sullivan); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake); *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day); *United States v. Rivas*, TDC-19-417 (D. Md.), ECF No. 72 (Order by Magistrate Judge Sullivan); *United States v. Chriscoe*, TDC-20-46 (D. Md.), ECF No. 131 (Order by Magistrate Judge Coulson); *United States v. Gray*, GJH-19-407, ECF No. 120 (Order by Judge Hazel); *United States v. Ellison*, ELH-19-286, ECF No. 427 (Order by Judge Copperthite); *United States v. Hill*, APM-19-260 (D.D.C.), Minute Order dated March 19, 2020. Because the

1

defendant's generic argument runs counter to the individualized determination required by the Bail Reform Act, and because the defendant has failed to make a sufficient factual showing to merit the relief sought, this Court should do the same and deny the motion, without a hearing.

**BACKGROUND**

The defendant was a mid-level drug trafficker who worked for the Adam Martin/Calvin Claxton Drug Trafficking Organization (the "DTO"). The defendant's responsibilities included personally conducting hand-to-hand drug transactions and overseeing lower-level "street hitters" responsible for distributing drugs for the DTO. On a near daily basis, law enforcement intercepted wire communications during which the defendant discussed his drug dealing. Some of the intercepts mentioned violence. For example, on one occasion, the defendant bragged to a senior co-conspirator about having assaulted an individual who was suspected of stealing packs of narcotics from the DTO. The co-conspirator laughed in response and said that he too wanted to assault the individual.

With respect to overt acts committed by the defendant, the Superseding Indictment alleged the following:

- On June 8, 2018, the defendant possessed with intent to distribute cocaine base and heroin.

- On July 2, 2018, the defendant possessed with intent to distribute cocaine and heroin, and possessed a loaded firearm

- On February 3, 2019, the defendant explained that a co-conspirator had heroin and cocaine stolen recently.

- On February 6, 2019, the defendant sold heroin and cocaine base to an undercover officer.

- On February 17, 2019, the defendant told a supplier that he had run out of heroin and was helping a co-conspirator sell the remaining amount of heroin.

- On February 28, 2019, the defendant called a co-conspirator to report that police had seized some of their drugs and to complaint that co-conspirators were carrying drugs on their person.

- On April 10, 2019, during a search warrant of the defendant's house, police recovered a Winchester shotgun.

In addition to the shotgun, police recovered from the defendant's home a substantial amount of paperwork demonstrating that he was a member of the Black Guerrilla Family (BGF) gang.

On June 20, 2019, the defendant was charged in a Superseding Indictment with conspiracy to distribute 1 kilogram or more of heroin, 280 grams or more of cocaine base, and cocaine, in violation of 21 U.S.C. § 846, which carries a statutory punishment of 10 years to life imprisonment.

At a detention hearing on June 26, 2019, the Government set forth substantial evidence in favor of detention, including the evidence described above. At the conclusion of the hearing, Magistrate Judge Gesner detained the defendant, finding that no release condition would reasonably assure the safety of any other person and the community. Specifically, the Court relied on the following: (1) the nature of the offense and role of the defendant, including consistent criminal activity be the defendant; (2) the weight of the evidence, which was substantial based on search warrants, wire intercepts, and evidence of violent acts committed by the defendant; (3) a criminal history that included armed robbery and possession with intent to distribute; and (4) his probationary status at the time of the offense, as well as a history of poor adjustment to community supervision, based on a prior violation of probation and continued criminal activity while on probation. ECF 68.

On April 14, 2020, the defendant filed a motion to reopen his detention hearing and vacate the order of detention. ECF No. 214. The defendant's only argument in favor of release is speculation regarding COVID-19. As detailed below, the motion should be denied without a hearing.

**ARGUMENT**

The defendant relies on the prospect of a mass COVID-19 outbreak at the Correction Detention Facility ("CDF") in Baltimore, where the defendant is currently housed. To date, there have been no documented case of COVID-19 at this facility, either in the detainee population or with respect to correctional officers. *Ellison*, ELH-19-286, ECF No. 427 (April 14, 2020). And, even if there were, the defendant's motion must be denied, without a hearing.

I.  **Legal Standard**

The defendant's motion, which focuses exclusively on the COVID-19 outbreak, largely ignores the factors a court must consider in determining whether a defendant poses a danger to the community and upon which Magistrate Judge Gesner relied in ordering detention. These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because of the nature of the charges against the defendant, the Government also is entitled to a presumption that no combination of release conditions will assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A).

II. **The Defendant's Motion Ignores Nearly All of the Section 3142(g) Factors, Which Weigh Heavily in Favor of Detention**

In this case, an examination of the § 3142 factors demonstrates that the detention order should remain in place.

A.  **The Nature and Circumstances of the Offenses**

The defendant was responsible for helping pump kilograms of poison into the streets of Baltimore, Maryland for the duration of the investigation. The defendant was, in essence, a street lieutenant responsible for overseeing the distribution of drugs to paying customers. The defendant

also sold drugs himself to paying customers. The defendant discussed committing violent acts with co-conspirators, made all the more dangerous by possession of a shotgun in his home. As the Court is well aware, neighborhood DTOs in Baltimore are responsible for hundreds of deaths in Baltimore each year, either as a result of violent acts committed by DTO members or overdose deaths suffered by the DTO's customers. Based on the volume of drugs, the defendant's role in the offense as a manager, the violent acts he claimed to commit, and the presence of a shotgun in his home, this is a quite seriousness offense, consistent with the defendant's criminal record.

### B. Weight of the Evidence

The evidence against the defendant is overwhelming. It established that he was a member of the DTO between September 2018 and April 2019. This was based on near-daily wiretap interceptions, during which the defendant was heard discussing the DTO's drug supply, who was working for him as a distributor, and where drugs were being stored, among other topics. The defendant personally sold drugs to an undercover officer. Police also executed a search warrant at the defendant's home resulting in the recovery of a shotgun as well as a low-level quantity of drugs.

### C. History and Characteristics of the Person

The defendant has no history of employment, did not graduate high school, and is a member of the Black Guerilla Family. He was arrested in this case at the young age of 20-years old, yet already has convictions for both a crime of violence and a drug trafficking crime. First, on November 3, 2015, the defendant was convicted for armed robbery and was placed on 2 year' probation. In February 2017, the defendant was found guilty for violating that probation.

Second, in November 2018, the defendant was convicted of possession with intent to distribute, and was placed on supervised probation before judgement for 2 years. As a result, he was on probation at the time he committed the instant offense.

The Pretrial Services Office reports that the defendant currently is being held without bond on a VOP detainer in Baltimore City Circuit Court in Case Number 118212009 with the next VOP hearing scheduled for July 12, 2020. As a result, if he were released from federal custody, he simply would be transported to state pretrial detention.

### D. The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

The defendant's release would pose a serious risk to the community in the form of handgun violence and/or damage to the public health through the distribution of dangerous narcotics. As Judge Coulson noted in a recent opinion denying a motion for pretrial release based on COVID-19, "Baltimore City had nearly 350 homicides in 2019—almost 60 per every 100,000 citizens. There were more than 700 nonfatal shootings. According to the Maryland Department of Health and the Office of the Chief Medical Examiner, there were almost 1000 additional deaths attributable to heroin, fentanyl and/or opioid overdose." *Gibson-Bey*, RDB-19-0563 (D. Md.), ECF 26, at 3 (internal citations omitted).

Indeed, like many of his co-conspirators, the defendant is a recidivist. He has not stopped, nor will he stop, dealing drugs and possessing guns. He will not comply with court-ordered supervision. If he were placed on location monitoring, there is little to stop him from continuing to deal drugs or simply deciding to flee. That is particularly the case where, as here, much of the conduct involved coordinating drug trafficking via cellular telephone. A substantial risk therefore exists that in the event of the defendant's release he would continue to deal drugs either personally or through intermediaries.

Moreover, the defendant does not propose a suitable third-party custodian, stating that he "expects that he can secure a suitable third-party custodian." ECF 214 at 3. This further compounds the danger to the community.

### III. Officials Have Established Comprehensive Health Measures at CDF to Avoid a COVID-19 Outbreak

The defendant himself does not contest this analysis, focusing instead on the health risks posed by the COVID-19 outbreak and ignoring the other § 3142 factors the Court must consider in determining whether a defendant poses a danger to the community and a flight risk.  To be sure, the Bail Reform Act instructs courts to consider the "physical and mental health" of the defendant as one of the factors in its analysis.  18 U.S.C. § 3142(g)(3)(A).  Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release.  Currently, there has not been any cases of COVID-19 at CDF in the detainee population or with respect to correctional officers.  The defendant does not have COVID-19.  The defendant does not allege that he has been exposed to any individuals with COVID-19.  In this way, he is not seeking release based on his *actual* "physical and mental health."  Instead he relies solely on the *possibility* of becoming infected.   As discussed below, however, CDF has implemented substantial precautionary measures to mitigate this risk.[1]

#### A. Comprehensive Precautionary Measures Have Been Instituted at CDF to Avoid a COVID-19 Outbreak

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has established a comprehensive set of precautionary measures to limit the risk of COVID-19 transmission into and inside CDF.[2]  DPSCS is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the

---

[1] The following individuals provided information about the health measures that have been established at CDF: (1) Gary McLhinney, DPSCS Assistant Secretary; (2) Sharon Baucom, DPSCS Director of Clinical Services; (3) Sterling Johnson, Supervisors, USMS for the District of Maryland; and (4) DPSCS Lieutenant Nina Riser.

[2] Although CDF is a facility for federal pre-trial detainees, it is managed by DPSCS pursuant to a contract with the USMS.

preventative actions advised by the Centers for Disease Control and Prevention ("CDC") and Maryland Department of Health ("MDH") regarding the disease.

DPSCS officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail, and longstanding policies and procedures already exist to ensure an outbreak does not occur of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza. When faced with the potential for transmission of other notable viruses in recent history—such as, Avian Influenza (i.e., bird flu), H1N1, Severe Acute Respiratory Syndrome (i.e., SARS), and Ebola—DPSCS facilities, including CDF, did not suffer any outbreaks.

That being said, DPSCS recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulted in a state of emergency. Accordingly, DPSCS has employed the following measures at CDF[3]:

- *Social Visitation.* DPSCS has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering CDF and interacting with detainees.[4] Defense attorneys are still permitted to visit their clients in person; however, attorneys and detainees are separated by a glass wall and communicate with each other through the use of a telephone. Two nurses are stationed at the entrance of CDF to ask the standard COVID-19-related health questions and take temperatures of anyone who enters the facility. Moreover, as a practical matter, virtually all attorney-client communications occur via teleconference.

---

[3] Because the health situation is rapidly evolving, new policies and procedures at CDF are constantly being implemented.

[4] Due to the hardship this poses, DPSCS has given each detainee five free telephone calls per week to ensure that each detainee is able to remain in contact with friends and family members. DPSCS is also in the process of implementing social visits via video conference.

- *Detainees Entering the Facility.*  Unlike many of DPSCS's facilities, which are needed to house the constant influx of new state arrestees, CDF houses federal detainees and, at this time, few federal detainees are entering CDF.  The only new detainees entering CDF are a limited number of new federal arrestees who present a particular safety risk to the community.  CDF, moreover, is not receiving any new detainees from other DPSCS facilities.

- *Screening Procedures.*  In the few instances in which a new detainee enters CDF, he will be housed in an intake facility for 14 days, where within two hours of arrival, he will be screened by medical professionals for coronavirus symptoms and exposure risk factors before being placed in the general population.  The detainee will also be screened by a medical professional a second time following the detainee's arrival.

- *Detainees 50 Years of Age or More.*  Detainees who are 50 years of age or more are now being housed in a separate unit. In addition, the medical staff is taking temperature readings of such detainees three times a day. Detainees who are 50 years of age or more in the Protective Custody Unit are remaining in the Protective Custody unit; however, the medical staff is taking three temperature readings a day for such detainees.

- *Detainee Movement.*  The Court's Standing Order 2020-07, issued April 10, 2020, postponed all criminal trials and non-emergency proceedings scheduled to commence through June 5, 2020.  This means that detainees will not need to leave CDF during this period for any court appearances, except for emergencies.  In the event that a detainee has a court appearance, he will be screened for symptoms before entering the transport van and, upon reaching the courthouse, his temperature will be taken twice via a forehead thermal reader to ensure he does not have a fever.  To further avoid the possibility of exposure, the USMS has issued a prohibition on prisoner transfers to the courthouse or elsewhere for proffers, including a prohibition on agent transport writs and Chief Judge Bredar memorandum requests that would permit agents to pick up prisoners from a facility.

- *Sanitation and Hygiene.*  Each detainee is in possession of his own supply of soap to wash his hands at any time throughout the day.  Moreover, CDF recently completed a $1.1 million shower renovation, as a result of which detainees may shower whenever they wish.  Signs and hand sanitizer have been posted throughout the facility, educating detainees and correctional officers about proper hygiene and encouraging them to wash their hands frequently.  The Secretary of DPSCS also has ordered that all facilities, including CDF, increase surface cleaning.  In addition to paid sanitation employees, CDF has trained a group of detainees whose full time job is constantly to disinfect and clean all surfaces that could be touched.  DPSCS also is producing substantial quantities of sanitizer at a facility in Hagerstown, to ensure that it has an adequate supply.  Finally, and importantly, each Correctional Officer has received a sneeze guard (protective mask), and are required to wear it at all times.  Each detainee has also received his/her own sneeze guard.

9

- *Quarantine*. DPSCS is following the CDC guidelines regarding testing for COVID-19 and isolation of individuals with symptoms and/or risk exposure factors. If a detainee exhibits flu-like symptoms or presents risk exposure factors, designated cells in a remote part of CDF have been set aside to serve as a quarantine area, where medical professionals can monitor those detainees. Across the street from CDF is a DPSCS facility with "negative pressure rooms," where the ventilation is designed to avoid re-circulating air into the general population to limit the possibility of cross-contamination from room to room.

- *Correctional Officers*. Although correctional officers will need to enter and re-enter the facility, they have received multiple mandatory trainings over the past week about how to mitigate the risk of exposing detainees to the disease. Correctional officers have been ordered to stay home if they have any symptoms of the disease, and advanced paid leave will be provided for any employees who have not accrued sufficient paid leave, to disincentive sick employees from coming to work to avoid loss of pay.

Finally, in order to ensure that the Court remains apprised of these and other precautionary measures, the USMS has been in contact with Chief Judge Bredar to respond to any inquiries regarding conditions at CDF and the measures being taken in response to the COVID-19 situation.

### B. The Defendant's Individual Circumstances Do Not Merit Release.

The defendant is 21-years old, and does not suffer from any risk factors that would make him particularly vulnerable to COVID-19. Further, when the defendant first was arrested and transported to CDF, he underwent an extensive intake process, whereby he was screened and examined by licensed medical professionals.

By virtue of being in a detention facility, the defendant is in the presence of medical professionals at all times. Each DPSCS facility has privatized medical doctors and nurses who monitor and provide care onsite to detainees who have chronic diseases, such as asthma, diabetes, and hypertension. There are multiple points of access for detainees with asthma and other chronic diseases to seek medical care, whether for routine or emergency needs, including on-site dispensaries, infirmaries, and clinics that provide acute and chronic treatment for these types of illnesses. DPSCS also contracts with on-site pharmacists, who are available to help providers make the best recommendations for Asthma therapy and other chronic diseases. In addition,

10

clinical pharmacists are on call at all times, day or night. If the defendant should need intensive treatment that cannot be provided inside CDF, there is a hospital located directly across the street from CDF to provide non-emergency care and detainees are transported to community hospitals in the event of an emergency.

Between the medical professionals at CDF and the medical professionals at the hospitals, the defendant has access to all of the care that he needs. In the unlikely event that the defendant becomes infected with COVID-19, he will be quarantined, monitored, and receive any needed treatment, consistent with the CDC guidelines. And if the defendant needs specialized care for an unforeseen illness or injury, the medical staff at CDF will refer him to an outside professional. In short, there are sufficient resources, both inside and outside CDF, to ensure that the defendant's medical needs are addressed.

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside. *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). In this case, the defendant simply has not made a factual record that his needs will not be met while detained. Granting a defendant's motion for release based on a general, speculative claim of harm flies in the face of the defendant-specific analysis required by 18 U.S.C. § 3142(f).

Furthermore, the defendant's proposed placement outside of the facility does not eliminate the danger of contracting COVID-19. *See United States v. Gray*, GJH-19-407, ECF No. 120 (recognizing "the unfortunate reality that public health officials are struggling to contain the spread

of the virus in the general public as well").  As mentioned above, the defendant has provided no release plan as to how he would avoid or mitigate the risk of COVID-19 should he be released to any of his unnamed third-party custodians.  Without the ability to detail who all lives in the suggested home as well as who all frequent said residence, and the ability to identify screening practices or concrete COVID-19 precautions at the residence, the limited and strictly enforced access to jails better "serves to minimize Defendant's COVID-19 exposure." *United States v. Smoot*, Crim. No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020)." Indeed, the defendant's multiple violations while under court supervision demonstrate that, just as he could not be trusted to comply with the conditions of his supervision in prior cases, he cannot be trusted to adhere to the social distancing guidelines that are so necessary to protect not only his own health, but the health of the community.  *See, e.g., United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

### C. Traditional Location Monitoring Is No Longer An Option for Pretrial Services.

Pretrial Services now has diminished ability to monitor defendants on home detention.  Due to COVID-19, the Court has suspended traditional electronic home monitoring that relies on radio frequency or GPS to provide real-time information about a defendant's whereabouts.  Although other forms of home detention are still available, "none provides 24/7 monitoring and notification." *Gibson-Bey*, RDB-19-563 (D. Md.), ECF 2, at 3 n.2.  Accordingly, Pretrial Services' ability to ensure that defendants do not become a flight risk or pose a danger to the community has been significantly curtailed.

Furthermore, electronic monitoring simply is not a replacement for incarceration, as home monitoring does not prevent others from coming to the defendant's residence, which increases the risk of the defendant violating the law, as well as his exposure to COVID-19. *See, e.g.*, *United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion to reopen detention hearing and vacate his order of detention.

Respectfully submitted,
Robert K. Hur
United States Attorney

/s/
Michael A. Goldsticker
Assistant United States Attorney